

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



---

MATTHEW PINSLY, derivatively on behalf of BANK OF AMERICA CORPORATION,

                    Plaintiff,

v.

BANC OF AMERICA SECURITIES, LLC, BANC OF AMERICA INVESTMENT SERVICES, INC., KENNETH D. LEWIS, WILLIAM BARNET III, FRANK P. BRAMBLE, SR., JOHN T. COLLINS, GARY L. COUNTRYMAN, TOMMY R. FRANKS, CHARLES K. GIFFORD, MONICA C. LOZANO, WALTER E. MASSEY, THOMAS J. MAY, PATRICIA E. MITCHELL, THOMAS M. RYAN, O. TEMPLE SLOAN, JR., MEREDITH R. SPANGLER, ROBERT L. TILLMAN, JACKIE M. WARD, J. STEELE ALPHIN, AMY WOODS BRINKLEY, AND JOSEPH L. PRICE,

                    Defendants,

and

BANK OF AMERICA CORPORATION,

                Nominal Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No.

**12 CIV 3003**

**JURY TRIAL DEMANDED**

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.    Plaintiff Matthew Pinsly ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Bank of America Corporation ("BAC" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers and the Company's subsidiaries, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from May 2003 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.     According to its public filings, BAC, through its subsidiaries, provides banking and financial services to individuals, small and middle-market businesses, corporations, and governments primarily in the United States and internationally. BAC is headquartered in Charlotte, North Carolina.

3.     Banc of America Securities ("BAS"), a former BAC subsidiary,[1] served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer for auction rate securities ("ARS") during the Relevant Period.[2] BAS's ARS turned out to be a disaster for investors and BAC stockholders and defendants knew, or should have known, they were designed to implode and ruin the markets and BAC.

4.     ARS were bonds or preferred stocks that paid interest or dividends at rates set at periodic auctions. ARS allowed issuers to obtain long-term financing at short-term interest rates, because investors reasonably expected to be able to access their principal at each periodic auction.

5.     Critically, despite defendants' knowledge to the contrary, ARS were not safe investment vehicles for investors (or, ultimately, the Company and its shareholders). Notably, a 2004 SEC investigation (discussed in detail herein) found that between January 2003 and June 2004, numerous ARS broker-dealers, including BAS, engaged in one or more practices that were not adequately disclosed to investors in violation of the federal securities laws. Further, the SEC investigated virtually the same actions complained of herein including, for example, BAC

---

[1]     BAS merged with Merrill Lynch & Co., Inc. ("Merrill Lynch") after the acquisition of Merrill Lynch in 2008.

[2]     Auction rate securities, which BAS served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer shall be referred to herein as "BA ARS."

*submitting their own orders to purchase or sell shares for their own accounts.*

6. Further, since at least March 2005, the "Big Four" accounting firms — including BAS's own auditor, PricewaterhouseCoopers LLP ("PwC") — the Financial Accounting Standards Board ("FASB"), and the SEC had determined that ARS *did not qualify as "cash equivalents."* Accordingly, given the Company's prior problems regarding ARS and the Company's own auditor telling them that ARS are not "cash equivalents" each of the members of the Board knew that their statements to the contrary were false and misleading when made.

7. In particular, during the Relevant Period, and unbeknownst to investors, defendants engaged in a scheme, practice, or course of conduct designed: (a) to manipulate the market for BA ARS to create the appearance that the securities traded at arm's-length auctions, when in reality the available supply well exceeded the demand; and (b) to mislead ARS buyers, through misrepresentations and omissions of material fact, about the risks, value, and liquidity of the securities.

8. As part of the scheme, BAS maintained a policy of placing or causing the placement of support bids in every auction for which it served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint auction dealer, to the extent necessary to create the appearance of stability and liquidity in the auction market, prevent auction failures, and set the rates of interest or dividends paid on those securities. In addition, BAS and Banc of America Investment Services ("BAIS"), another former BAC subsidiary,[3] falsely described ARS, including BA ARS, as highly liquid investments that were appropriate for short-term investing, when the market for those securities was only sustained due to defendants' manipulative conduct.

---

[3] BAIS likewise merged with Merrill Lynch in 2009.

9.     The goal of the scheme was to allow defendants to underwrite billions of dollars of BA ARS and to sell those securities, including defendants' own inventory, at par value when they were worth significantly less. The scheme allowed defendants to reap billions of dollars in underwriting and auction dealer fees at the expense of investors who actually purchased illiquid BA ARS at inflated prices. For instance, according to a Form 8-K filed by the Company on May 28, 2009, 5,600 of the Company's customers held approximately *$5.3 billion* in ARS (all of which were eventually rendered illiquid).

10.     Like any other illicit scheme, defendants were living on borrowed time and their house of cards collapsed on February 13, 2008. On that date 87% of all auctions of ARS failed when all of the major broker-dealers refused to continue to support the phony auctions, because they were eating up necessary capital for the broker-dealers during the beginning of the global economic meltdown in 2008.

11.     The next day, February 14, 2008, it was disclosed that UBS, the second-largest underwriter of ARS, had decided to no longer support the auction market. Virtually every other major broker-dealer (including, among others, Goldman Sachs, Lehman Brothers, and Citigroup) also decided around the same time to withdraw their support of the auction market. As a result of the nearly simultaneous withdrawal of support by all of the major broker-dealers, the market for ARS collapsed, rendering more than *$300 billion* of outstanding, supposedly "safe" securities illiquid. After the ARS market collapsed, the SEC launched an investigation into the Company's illicit practices.

12.     Per a press release issued on October 8, 2008 by the SEC, entitled, "Bank of America Agrees in Principle to ARS Settlement," the SEC's investigation involved allegations "that Bank of America made misrepresentations to thousands of its customers when it told them

that ARS were safe and highly liquid cash and money market alternative investments."

13.     Additionally, according to the press release, as a result of defendants' actions, the Company was forced to buy back up to *$4.7 billion* in ARS purchased before February 2008. Upon information and belief, the Company did, in fact, buy back all *$4.7 billion* in ARS.

14.     Significantly, as mentioned above, this is not the first time the Company has come under fire for defendants' illicit ARS related tactics.  For instance, in 2004, the SEC began an investigation of virtually the same actions complained of herein including, for example, *submitting their own orders to purchase or sell shares for their own accounts*.

15.     Two years later (and two years prior to the collapse of the ARS market), on May 31, 2006, a number of major broker-dealers, *including BAS* entered into a consent decree with the SEC (the "2006 Consent Decree"). The 2006 Consent Decree summarized the findings of the 2004 SEC investigation -- namely, that between January 2003 and June 2004, each broker-dealer named therein, including BAS, engaged in one or more practices that were not adequately disclosed to investors in violation of the federal securities laws.

16.     The 2006 Consent Decree required the broker-dealers named therein, including BAS, to disclose certain auction practices and procedures to investors and to immediately stop engaging in certain other illicit practices.  In addition, each broker-dealer named therein was required, not later than six (6) months from the date of the order, to have its Chief Executive Officer ("CEO") or its general counsel certify in writing to the SEC that it had implemented procedures reasonably designed to prevent and detect violations in the ARS area.  Finally, the broker-dealers named therein were required by the terms of the 2006 Consent Decree to pay civil penalties totaling $13 million.  Of this amount, BAS was responsible for paying $750,000. Accordingly, the Board was aware of BAS's prior ARS problems, and thus, was under a specific

and direct duty to actively supervise this line of business to mitigate the Company's exposure to ARS related liabilities. Additionally, defendants cannot feign ignorance of the BAS's ARS problems because, as discussed above, the Company's own auditor, PwC, specifically determined and stated that ARS were not liquid or safe investments.

17.     Further, immediately following the Company's most recent settlement with the SEC in 2008 (and more generally, the near-collapse of the world's financial markets in October, 2008), a flurry of the Company's directors and officers resigned and/or retired from their respective positions in 2009. For instance, in 2009, the following directors left the Company: William Barnet III ("Barnet"), John T. Collins ("Collins"), Gary L. Countryman ("Countryman"), Tommy R. Franks ("Franks"), Patricia E. Mitchell ("Mitchell"), O. Temple Sloan, Jr. ("Sloan"), Meredith R. Spangler ("Spangler"), Robert L. Tillman ("Tillman") and Jackie M. Ward ("Ward"). The executive suite suffered the same fate with the following senior officers leaving the Company in 2009: Amy Woods Brinkley ("Brinkley"), Kenneth D. Lewis ("Lewis"), and J. Steele Alphin ("Alphin").

18.     Because of the events described above, on June 13, 2008, Plaintiff issued a demand pursuant to Del. Ct. Ch. R. 23.1 (the "Demand") on the Board to commence an action against certain current and/or former directors and executive officers of the Company. A true and correct copy of the Demand is attached hereto at Exhibit A.

19.     On August 12, 2010, more than *two years* after the issuance of the Demand, the Board, through the Company's Associate General Counsel and Assistant Corporate Secretary, Jennifer E. Bennett ("Bennett") sent a letter to Plaintiff indicating that the Board, through its Audit Committee (the "Audit Committee"), had purportedly conducted an investigation and decided to refuse the demand (the "Refusal"). Ms. Bennett further stated that in connection with

the so-called "investigation" of the issues raised in the Demand that over 100,000 pages of documents were reviewed and that "interviews of numerous individuals"[4] were conducted.

20.     The Refusal, however, provided no explanation as to what these purported "investigation" efforts – which the Plaintiff stockholder was forced to wait over two years for – actually revealed.  Accordingly, even after two years, the Plaintiff stockholder has not been provided with a basis for issuance of the Refusal.  A true and correct copy of Ms. Bennett's letter is attached hereto as Exhibit B.

21.     The Board's Refusal and its failure to provide any explanation for the basis of the Refusal are improper and demonstrate its lack of diligence and good faith.

22.     Thus, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1337. Defendants regularly conduct business within this District, and many of the acts giving rise to the

---

[4]     No detail was provided as to the nature of documents reviewed or specifically who was interviewed.

violations complained of herein took place in this District.

## THE PARTIES

26.     Plaintiff is a current shareholder of BAC and has continuously held BAC stock since 2005. Plaintiff is a citizen of Florida.

27.     Nominal defendant BAC is a Delaware corporation headquartered in Charlotte, North Carolina. According to its public filings, BAC, through its subsidiaries such as BAS and BAIS, provides banking and financial services to individuals, small- and middle-market businesses, corporations, and governments primarily in the United States and internationally.

28.     Defendant Frank P. Bramble, Sr. ("Bramble") has served as a director of the Company since January 2006. Upon information and belief, defendant Bramble is a citizen of Maryland.

29.     Defendant Charles K. Gifford ("Gifford") has served as a director of the Company since April 2004. Upon information and belief, defendant Gifford is a citizen of New York.

30.     Defendant Monica C. Lozano ("Lozano") has served as a director of the Company since 2005. Upon information and belief, defendant Lozano is a citizen of New York.

31.     Defendant Thomas J. May ("May") has served as a director of the Company since April 2004. In addition, defendant May has served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant May is a citizen of Massachusetts.

32.     Defendant Joseph L. Price ("Price") served as the President of Consumer and Small Business Banking of the Company from February 2010 until 2011. In addition, defendant Price served as the Chief Financial Officer ("CFO") of the Company from January 2007 to January 2010 and as the Global Corporate and Investment Banking Risk Management Executive

from June 2003 to December 2006. Upon information and belief, defendant Price is a citizen of North Carolina.

33.     Defendant Brinkley served as the Company's Global Risk Executive from 2001 to 2009. Upon information and belief, defendant Brinkley is a citizen of North Carolina.

34.     Defendant Barnet served as a director of the Company from 2004 until he resigned in 2009. In addition, defendant Barnet served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Barnet is a citizen of South Carolina.

35.     Defendant Collins served as a director of the Company from 2004 until he resigned in 2009. In addition, defendant Collins served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Collins is a citizen of Massachusetts.

36.     Defendant Countryman served as a director of the Company from 2004 until he resigned in 2009. Upon information and belief, defendant Countryman is a citizen of Massachusetts.

37.     Defendant Franks served as a director of the Company from 2006 until he resigned in 2009. In addition, defendant Franks served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Franks is a citizen of Oklahoma.

38.     Defendant Walter E. Massey ("Massey") served as a director of the Company from 1998 until 2011. In addition, defendant Massey served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Massey is a citizen of Illinois.

39.     Defendant Thomas M. Ryan ("Ryan") served as a director of the Company from 2004 until 2011.  Upon information and belief, defendant Ryan is a citizen of Rhode Island.

40.     Defendant Mitchell served as a director of the Company from 2001 until she resigned in 2009.  Upon information and belief, defendant Mitchell is a citizen of New York.

41.     Defendant Sloan served as a director of the Company from 1996 until he resigned in 2009.  Upon information and belief, defendant Sloan is a citizen of North Carolina.

42.     Defendant Spangler served as a director of the Company from 1988 until she resigned in 2009.  Upon information and belief, defendant Spangler is a citizen of North Carolina.

43.     Defendant Tillman served as a director of the Company from 2005 until he resigned in 2009.  Upon information and belief, defendant Tillman is a citizen of North Carolina.

44.     Defendant Ward served as a director of the Company from 1994 until she resigned in 2009.  Upon information and belief, defendant Ward is a citizen of Indiana.

45.     Defendant Alphin served as the Company's Chief Administrative Officer and Global Personnel Executive from 1999 until his "retirement" in 2009.  Upon information and belief, defendant Alphin is a citizen of North Carolina.

46.     Defendant Lewis served as the Chief Executive Officer ("CEO") of the Company from 2001 to 2009.  Upon information and belief, defendant Lewis is a citizen of North Carolina.

47.     Defendant BAS was a wholly owned subsidiary of BAC.  Defendant BAS merged with Merrill Lynch after the acquisition of Merrill Lynch in 2008.  Defendant BAS was headquartered in New York, New York.

48.     Defendant BAIS was a wholly owned subsidiary of BAC.  Defendant BAIS merged with Merrill Lynch in 2009.  Defendant BAIS was headquartered in Boston,

Massachusetts.

49.     Collectively, defendants Lewis, Barnet, Bramble, Collins, Countryman, Franks, Gifford, Lozano, Massey, May, Mitchell, Ryan, Sloan, Spangler, Tillman, Ward, Alphin, Brinkley, and Price shall be referred to herein as the "Individual Defendants."

50.     Collectively, defendant Barnet, Collins, Franks, Massey, and May shall be referred to herein as the "Audit Committee Defendants."

51.     Collectively, the Individual Defendants, BAS, and BAIS shall be referred to as "Defendants."

## INDIVIDUAL DEFENDANTS' DUTIES

52.     By reason of their positions as officers, directors, and/or fiduciaries of BAC and because of their ability to control the business and corporate affairs of BAC, Individual Defendants owed BAC and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage BAC in a fair, just, honest, and equitable manner. Individual Defendants were and are required to act in furtherance of the best interests of BAC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to BAC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

53.     Individual Defendants, because of their positions of control and authority as directors and/or officers of BAC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with BAC, each of the Individual Defendants had knowledge of material

non-public information regarding the Company.

54.     To discharge their duties, the officers and directors of BAC were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of BAC were and are required to, among other things:

   a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

   c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

55.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee were and are required, *inter alia*, to:

   a. Review and discuss with management the consolidated audited financial statements;

   b. Based upon review and discussion with management, recommend to the Board that the audited consolidated financial statements be included in the Company's annual Form 10-K;

   c. Review and discuss with management quarterly consolidated financial results and primary components of the press release prior to the public announcement of such results;

   d. Review with management the Company's program for compliance with laws and regulations and review the records of such compliance; and

   e. Oversee and assess the Company's policies and procedures for managing and evaluating risk.

## SUBSTANTIVE ALLEGATIONS

### A.     Background of ARS

56.     ARS were long-term or perpetual variable-rate equity or debt instruments that paid interest or dividends at rates set at periodic "auctions." Although described and marketed as safe and liquid investments, ARS were neither safe, nor liquid and would implode when Defendants' scheme could no longer be maintained and the truth revealed.

57.     ARS were issued by closed-end preferred funds; states, state agencies, municipalities, or other governmental authorities; public or private student loan originators and lenders; and other corporations and entities.

58.     The market for ARS experienced dramatic growth since the securities were first introduced in 1984. At the end of 2005, approximately $263 billion of ARS were outstanding. In the subsequent 26 months, the ARS market grew by nearly 25 percent. By February 2008, the market for ARS exceeded $330 billion.

59.     When ARS were first introduced in the mid-1980s, they were only available to highly sophisticated institutional investors with required minimum purchases of $250,000 or more. Prior to the beginning of the Relevant Period, issuers and underwriters lowered the minimum investment to $25,000. The reduced minimum investment enabled sellers to market auction rate securities to retail investors including individuals, charities, and small businesses.

### 1.     The Auction Process

60.     Prior to February 2008, ARS typically traded at par value through periodic "Dutch" auctions generally held every 7, 28, 35, or 49 days. The auctions determined which investors would own the securities as well as the "clearing rate," the rate of interest or dividends paid on those securities until the next periodic auction. Auction procedures typically allowed participants to submit orders to buy, sell, or hold ARS.

61.    ARS allowed issuers to obtain long-term financing at less expensive, short-term rates. ARS purchasers were willing to accept short-term rates because they reasonably believed that ARS could readily be disposed of at par through the periodic auctions.

62.    Issuers of ARS selected and paid firms, including BAS, to act as the dealer through which investors submitted orders at auctions for the issuers' securities. The firm selected to receive bids was called an "auction dealer," "broker-dealer," or "auction manager," and was said to "participate" in auctions.[5] Investors also could place orders at auctions through other designated brokerages, often referred to as "remarketing agents" or "distributing firms," which then would transmit those orders to the auction dealer. The firm that underwrote an issuance of ARS typically served as auction dealer for those securities.

63.    In a successful auction, the number of shares bid for purchase at a particular rate was equal to or greater than the number of shares offered for sale at that rate. All shares for sale were purchased, and the clearing rate, *i.e.*, the lowest interest or dividend rate at which all sale orders could be fulfilled, applied to all securities sold until the next auction. An auction failed if the number of shares offered for sale exceeded the number of shares bid for purchase.

64.    If the auction failed, then none of the current holders could sell their shares, as ARS have no "put" feature guaranteeing that an investor can either sell the securities back to the auction dealer on demand at par value or force the issuer to redeem the securities. If an auction failed, however, the holder of an ARS was entitled to collect dividends or interest at a predetermined rate until the next auction. The predetermined rate of interest that was paid in the event of a failed auction was typically referred to as the "maximum rate."

65.    The maximum rate was intended to ensure that the ARS remained liquid if the

---

[5] The term "auction dealer," as used in this complaint, is synonymous with the terms, "broker-dealer" and/or "auction manager."

auction failed, by attracting new buyers or prompting the issuer to refinance. If the maximum rate was insufficient to attract liquidity in the event of an auction failure, however, the risk characteristics of the ARS were fundamentally altered. An ARS that carried a low maximum rate was entirely dependent on the auction dealer's intervention and "support" for the periodic auctions to ensure liquidity, and in the absence of the auction dealer's support, any auction failure would render the security illiquid, as the maximum rate could not be counted on to attract new buyers or prompt the issuer to refinance.

## 2. **Defendants Caused the Company to Market BA ARS**

66. Defendants were actively involved in the ARS market throughout the Relevant Period. BAS served as an underwriter for ARS and served as the sole auction dealer in "sole-managed" auctions (where only one auction dealer was signed up to participate), and as a lead auction dealer, co-lead auction dealer, or joint lead auction dealer in "multi-dealer" auctions (where multiple auction dealers were signed up to participate). BAS and BAIS sold ARS, including BA ARS, to investor clients.

67. During the Relevant Period, Defendants caused the Company to underwrite billions of dollars of ARS, placing additional supply in what was known to be an already saturated market. For instance, according to a Form 8-K filed by the Company on May 28, 2009, 5,600 of the Company's customers held approximately $5.3 billion in ARS.

68. To accommodate the demands of issuers and obtain high credit ratings even as underwriting standards deteriorated over the course of the Relevant Period, BA ARS were issued with maximum rates that were capped at insufficient levels to attract liquidity in the event of an auction failure. Therefore, Defendants needed to suppress auction failures to prevent these low maximum rates from becoming widely known to ARS investors.

69.     Throughout the Relevant Period, Defendants engaged in deceptive and manipulative tactics directed at ARS investors to create the appearance of a functioning auction market in which ARS traded in accordance with actual supply and demand. Defendants' manipulative conduct included: (1) maintaining a policy of intervening in every auction for which BAS served as the sole or lead auction dealer, to the extent necessary to prevent the auction from failing, to create the appearance of stability in the ARS market and to mask the inherent illiquidity of ARS, including BA ARS; (2) making false and misleading statements and incomplete disclosures about the liquidity of BA ARS and BAS's role in propping up the ARS market; (3) routinely intervening in auctions to set the rates of interest or dividends paid on those securities and deprive investors of the information necessary to assess the risk and volatility of BA ARS; and (4) directing their brokers to promote and sell BA ARS through material misrepresentations and omissions.

70.     The scheme began to unravel when auction dealers allowed a discrete segment of the ARS market to fail, as credit markets weakened in the summer and fall of 2007. In particular, auction dealers were forced to allow the ARS market to fail because they needed to protect their liquid capital (which ARS clearly were not) during the impending financial crisis in 2008.

71.     When these auctions failed, many institutional investors began liquidating their positions in ARS, and the overall deterioration in credit markets led to further selling pressure from corporate and retail holders of ARS. In response, BAS and BAIS expanded the range and extent of their manipulative practices in an attempt to simultaneously prop up the remainder of the ARS market, conceal the liquidity characteristics of BA ARS, and protect Defendants from the consequences of their policy of intervening in the auctions.

**i. The Individual Defendants Caused BAS To Maintain A Practice Of Intervening In Every Auction For Which It Was The Sole Or Lead Auction Dealer, If Necessary To Prevent The Auction From Failing, To Create The Appearance Of Stability And Liquidity**

72.     As described above (and in further detail below), the 2006 Consent Decree noted that in many cases, the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed publicly. The 2006 Consent Decree, however, did not end the practice of broker-dealers submitting bids for their own accounts after receiving notice of what orders their customers planned to place, so long as the broker-dealers disclosed this practice to their customers.

73.     Critically, despite this massive exposure that the Company faced as evidenced by the 2006 Consent Decree, upon information and belief there was no public indication that Defendants took any action to better control, manage, or oversee this exposure.    Rather, Defendants treated the 2006 Consent Decree as a "slap on the wrist" and proceeded to conduct business as usual.

74.     Consistent therewith, throughout the Relevant Period, the Individual Defendants caused BAS to use its own capital to place "support bids" in auctions in which it served as the sole auction dealer or as the lead auction dealer in multi-dealer auctions.  The placement of such support bids was done pursuant to a tacit understanding among BAS and the issuers of BA ARS that the auction dealer would act to prevent auction failures.

75.     Through the placement of these support bids, the Individual Defendants caused BAS to purchase BA ARS for its own account when the auctions otherwise would have failed due to lack of sufficient demand.

76.     Until around February 13, 2008, the Individual Defendants caused BAS to follow a uniform policy of placing support bids, if needed to prevent auction failures, in every auction

for which it was sole or lead auction dealer.

77.     BAS was able to place support bids and prevent auctions from failing, because it was aware of the other bids in the auctions and could place its own bids after the bidding deadline for other investors.

78.     The Individual Defendants failed to disclose to investors that they caused the Company to invariably place support bids in every auction for which it was the sole or lead auction dealer during the Relevant Period as necessary to prevent auction failures, that it did so pursuant to an agreement with the issuer that it would suppress auction failures, and that the impact of its extensive and sustained interventions created the outward appearance that BA ARS were readily liquid investments and that the auction market functioned by the natural interplay of supply and demand.

79.     By intervening to prevent auction failures, the Individual Defendants masked the liquidity risks inherent to BA ARS. Due to the lack of transparency in the auction market, investors had no way of knowing the extent to which BAS's interventions were needed to sustain the auction rate market and ensure that auctions continued to clear.

80.     Had the Individual Defendants not caused BAS to support these auctions, or had the Individual Defendants disclosed the extent of its interventions, widespread auction failures would have alerted the public to the true risk characteristics of the ARS for which BAS served as an auction dealer. Instead, the Individual Defendants' actions created a "façade of liquidity," leading purchasers of ARS to believe their investments could be readily liquidated through arm's-length sales at periodic auctions.

### ii.   The Individual Defendants Caused BAS to Routinely Intervene In Auctions To Set The Rates of Interest Paid On BA ARS

81.     The Individual Defendants caused BAS to set the clearing rate for the auctions

that would have failed but for the Company's support bids throughout the Relevant Period. For each auction, the Individual Defendants knew all the bids that had been placed by both holders and prospective buyers of the securities. Armed with this information, the Individual Defendants caused BAS to place buy bids at specified rates and in sufficient amounts that ensured the auction would clear at those specified rates.

82.     Throughout the Relevant Period, the Individual Defendants caused BAS to set interest rates in such a manner as to promote continued sales of ARS to the public, but without letting clearing rates become or remain so high as to alienate the issuer clients on whom BAS depended for continuing business and attendant underwriting commissions and auction dealer fees.

83.     By intervening in the auctions, the Individual Defendants caused BAS to set the clearing rate but also added BA ARS to its own inventory. The Individual Defendants caused BAS, BAIS, and distributing firms then to reduce the excess inventory between auction periods by selling BA ARS at the clearing rate that BAS had established at the previous auction.

84.     Because purchasers of income securities such as bonds and preferred stocks consider higher interest rates to be an indicator of higher risk, BAS's interventions to manage interest rates and suppress auction failures deprived investors of objective information that was needed to evaluate the true risk characteristics of BA ARS.

85.     Thus, the Individual Defendants' conduct in rigging the clearing rates sent a false signal about the fair price, liquidity and risk of BA ARS.

### 3.     During The Relevant Period, The Individual Defendants Caused BAS And BAIS To Omit Material Facts About BAS's Role In The Auction Market In Violation Of the 2006 Consent Decree And Materially Misrepresented The Liquidity Of And Risks Associated With ARS

86.     As part of the scheme alleged herein, the Individual Defendants caused BAS and

BAIS to make false and misleading statements of material fact and omissions of material fact about auction rate securities, including BA ARS, to the investing public.

87.     To perpetuate the ARS market and sustain BAS's business underwriting ARS and managing auctions, the Individual Defendants caused BAS and BAIS to direct their brokers throughout the United States to represent to investors in written materials and uniform sales presentations that ARS were "equivalent to cash" and were "safe," "highly liquid," and appropriate as short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

88.     The Individual Defendants, however, *knew* that ARS *were not highly liquid short-term investments*. Since at least March 2005, the "Big Four" accounting firms — including BAC's own auditor, PwC, FASB, and the SEC had determined that ARS *did not qualify as "cash equivalents."* Specifically, in PwC's *DataLine* 2005-05 advisory paper they stated that ARS are not cash equivalents and the "other three major accounting firms all presently hold a similar view." Additionally, according to the SEC's *Current Accounting and Disclosure Issues in the Division of Corporation Finance*, 11/30/06, II.H.3, "because the auction rate securities have long-term maturity dates and there is no guarantee the holder will be able to liquidate its holdings, these securities do not meet the definition of cash equivalents in paragraphs 8 and 9 of FASB Statement No. 95, *Statement of Cash Flows*." Accordingly, Defendants were well aware that ARS were not liquid cash equivalents since at least March 2005 and, by the latest, November 2006.

89.     Notwithstanding this timely knowledge, pursuant to the Individual Defendants' directives, BAS's and BAIS's brokers sold ARS, including BA ARS, without disclosing the following material facts about those securities before or at the time of sale:

a. ARS, including BA ARS, were not cash alternatives, but were long-term financial instruments;

b. With the exception of some ARS with maximum rates high enough to attract liquidity or cause the issuer to refinance, ARS, including BA ARS, lacked features designed to ensure the holder's ability to sell the security, and in the event of an auction failure, the purchaser would be required to hold the security to maturity or indefinitely;

c. Many ARS, including BA ARS, were subject to interest rate caps, which if triggered, would reset their interest rates to levels well below market rates for comparable securities, often as low as zero, and render those securities illiquid;

d. ARS, including BA ARS, appeared readily liquid at the time of purchase and sale only because BAS and other auction dealers were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability;

e. The short-term nature of ARS, including BA ARS, and the ability of investors to liquidate those securities at par depended on the perpetuation of the artificial auction market by BAS and the other auction dealers;

f. BAS and other auction dealers had reached an understanding that the interests of each auction dealer would be served by intervening where possible to suppress auction failures, and pursuant to that understanding, BAS systematically intervened to prevent auction failures, thereby making BA ARS appear more liquid than they in fact were, and concealing the extent to which

BA ARS were dependent on BAS's continued intervention to remain liquid;

g. The periodic auctions at which the rates of interest or dividends on ARS, including BA ARS, were set required that investors actively bid their securities to maximize the rate of return on their investments and minimize the impact of manipulative conduct by BAS and other auction dealers, and in the absence of the investor's active participation in the time consuming and highly specialized process of monitoring "price talk" and the bidding process, investors were likely to earn interest or dividends at reduced rates; and

h. In the event of persistent auction failures, the ARS, including BA ARS, would only be able to be sold at a substantial discount from their purchase price, if at all.

90. Pursuant to the Individual Defendants' directives, BAS's and BAIS's brokers sold ARS, including BA ARS, without disclosing the following material facts about BAS's role in the auctions and the auction market in which those securities were traded before or at the time of sale in direct violation of the 2006 Consent Decree:

a. The auction market operated without transparency to investors, thus enabling manipulation by BAS, as well as other auction dealers;

b. The "auctions" for ARS were not true auctions, as BAS and other auction dealers submitted "support" bids and engaged in other manipulative practices for their own accounts in auctions that would have otherwise failed during the Relevant Period, did so with knowledge of the other bids in the auctions, and often did so after the bidding deadline imposed on other investors;

c. BAS directly or indirectly set the clearing rate in most of the auctions in

which it submitted bids during the Relevant Period;

d. BAS managed the interest rates for BA ARS to ensure that rates of interest or dividends paid were at levels sufficiently low to attract continued interest from BAS's issuer clients in subsequent BA ARS issuances, while paying sufficient interest to make BA ARS capable of being sold to retail investors;

e. By manipulating the auctions for BA ARS, BAS prevented investors from learning the true risk, value, and liquidity features of those securities;

f. The Individual Defendants intended to continue to market ARS, including BA ARS, as cash equivalent and highly liquid, safe investments, even if they determined that BAS and other auction dealers were likely to stop supporting and manipulating the auctions at any time; and

g. Purchasers of ARS, including BA ARS, were expected to monitor the auctions at all times to protect their interests, as BAS and other auction dealers considered themselves free to "manage" auction outcomes and withdraw their support for the auctions at any time.

91. Pursuant to the Individual Defendants' directives, BAS's and BAIS's brokers sold BA ARS without disclosing the following material facts about the conflicts of interest between the Individual Defendants' brokerage and investment banking operations with respect to BA ARS before or at the time of sale:

a. Defendants allowed the interests of their investment banking operations, which underwrote and managed auctions for BA ARS in exchange for lucrative underwriting commissions and auction management fees, to prevail over the obligations of fair dealing and full disclosure of its brokerage

operations; and

b. BAS managed interest rates to ensure that the rates paid on BA ARS were high enough to attract buyers, but low enough not to upset the issuer clients for whom BAS had underwritten the ARS offerings and to whom BAS had made express and implied commitments that it would manage rates within acceptable levels and prevent auction failures.

92. The Company's brokers failed to disclose the information above to investors, because they had not been provided with that information by the Individual Defendants during the Relevant Period.

93. As a result, the Company's brokers lacked even a rudimentary understanding about ARS, including BA ARS, and how the ARS market functioned during the Relevant Period.

94. Further, the Individual Defendants caused it to be BAS's and BAIS's practice not to deliver a prospectus to investors who purchased ARS, including BA ARS, at periodic auctions, as the Individual Defendants treated such purchases as "secondary market sales" exempt from the prospectus delivery requirement.

95. The Individual Defendants did not provide prospectuses to investors who purchased BA ARS from distributing firms, or require the disclosure of any other material information to such purchasers by the distributing firm.

96. The Individual Defendants acknowledged in certain written disclosures that the Company might intervene in auctions, but suggested that it did so only sporadically. The Individual Defendants did not disclose the extent of the Company's interventions, the purpose of its interventions, or the impact of its interventions on the market for BA ARS, and the attendant risks of acquiring ARS in direct violation of the 2006 Consent Decree. The Individual

Defendants failed to provide any disclosures to investors who purchased BA ARS from distributing firms, even though it knew that the distributing firms would not be disclosing the facts surrounding BAS' interventions in the periodic auctions for BA ARS.

97.     Thus, during the Relevant Period, the Individual Defendants did not disclose that they maintained a policy of placing support bids as needed to suppress auction failures in every auction for which it served as sole or lead auction dealer, that these support bids masked the lack of liquidity in the market, that the auctions would fail without these support bids and that they effectively set the rates of interest paid.

**B.      The Truth Begins to Emerge**

98.     When the credit market began to deteriorate in the summer of 2007, several major auction dealers, including Merrill Lynch, Lehman Brothers, and Deutsche Bank, chose not to intervene to prevent failures of auctions for certain ARS that credit markets viewed as particularly undesirable because they needed to protect their overall cash position in advance of the global economic meltdown in 2008.

99.     Following these auction failures, the Individual Defendants continued to monitor the industry for auction failures by other auction dealers throughout the fall of 2007 and into early 2008.  BAS and other auction dealers continued to support the ARS market until they collectively abandoned it in February 2008.

100.     Specifically, on February 13, 2008, *87%* of all auctions of ARS failed when all of the major broker-dealers refused to continue to support the auctions in an effort to maintain their capital positions in the deteriorating worldwide economy.

101.     The next day, February 14, 2008, it was disclosed that UBS, the second-largest underwriter of ARS, had decided to no longer support the auction market.  Virtually every other

major broker-dealer (including, among others, Goldman Sachs, Lehman Brothers, and Citigroup) also decided around the same time to withdraw their support of the auction market.

102.     As a result of the nearly simultaneous withdrawal of support by all of the major broker-dealers, the ARS market collapsed, rendering more than *$300 billion* of outstanding securities illiquid.

103.     At no time prior did the Individual Defendants notify investors or publicly announce that it intended to withdraw its support for the BA ARS market.

104.     As a result of the withdrawal of support by BAS and other auction dealers, the ARS market has permanently collapsed, rendering outstanding ARS, including BA ARS, illiquid.

C.     **The Settlement With the SEC**

105.     After the ARS market finally collapsed, the SEC launched another investigation into the Company's illicit practices.

106.     Per a press release issued on October 8, 2008 by the SEC, entitled, "Bank of America Agrees in Principle to ARS Settlement," the SEC's investigation involved allegations "that Bank of America made misrepresentations to thousands of its customers when it told them that ARS were safe and highly liquid cash and money market alternative investments."

107.     According to the press release, the SEC contended that the promised liquidity "was premised on Bank of America providing support bids for auctions when there was not enough customer demand, and Bank of America did not adequately disclose this support to customers. Bank of America continued to market ARS as cash and money market alternatives despite its awareness of the escalating liquidity risks in the weeks and months preceding the collapse of the ARS market."

108. Additionally, according to the press release, as a result of the Individual Defendants' actions, the Company has been forced to buy back up to *$4.7 billion* in ARS purchased before February 2008.

109. On September 18, 2008, Linda Chatman Thomsen, the SEC's Director of the Division of Enforcement, testified before Congress that "broker-dealer firms that underwrote, marketed and sold auction rate securities (ARS) misled their customers." Thomsen continued:

> Through their sales forces, marketing materials, and account statements, firms misrepresented to their customers that ARS were safe, highly liquid investments that were equivalent to cash or money market funds. As a result, numerous customers invested in ARS their savings and other funds they needed to have available on a short-term basis. These firms failed to disclose the increasing risks associated with ARS, including their reduced ability to support the auctions. By engaging in this conduct, *those firms violated the Federal securities laws, including the broker-dealer antifraud provisions*.

110. Implicit in the SEC's determination is that the Individual Defendants' previous disclosures to their investor clients concerning their ARS practices and procedures, including those published on BAC's website beginning in 2006, were inadequate and do not insulate the Individual Defendants from liability.

111. On October 8, 2008, the SEC also announced that Defendants had agreed to a settlement in principle with federal and state regulators that permanently enjoins BAS and BAIS "from violating the provisions of Section 15(c) of the Securities Exchange Act of 1934, and Rule 15c1-2 thereunder, which prohibit the use of manipulative or deceptive devices by broker-dealers."

**D.    The Prior SEC Consent Decree**

112. Significantly, as mentioned above, this was not the first time the Company has come under fire for the Individual Defendants' ARS related tactics. In particular, in 2004, the SEC began to investigate virtually the same actions complained of here including, for example,

*submitting their own orders to purchase or sell shares for their own accounts*.

113.    Two years later (and two years prior to the collapse of the ARS market), on May 31, 2006, the SEC entered into the 2006 Consent Decree with a number of major broker-dealers, *including BAS*. The 2006 Consent Decree summarized the findings of the SEC investigation -- namely, that between January 2003 and June 2004, each broker-dealer named therein, including BAS, engaged in one or more practices that were not adequately disclosed to investors in violation of the federal securities laws.[6] The violative conduct cited by the SEC, which, in certain instances, as discussed above was again repeated by the Individual Defendants, included among other things:

- intervening in auctions by bidding for a firm's proprietary account or asking customers to make or change orders in order to prevent failed auctions, set a "market" rate, or prevent all-hold auctions;

- allowing customers to place open or market orders in auctions;

- submitting or changing orders, or allowing customers to submit or change orders, after auction deadlines;

- not requiring certain customers to purchase partially-filled orders even though the orders were supposed to be irrevocable;

- having an express or tacit understanding to provide certain customers with higher returns than the auction clearing rate; and

- providing certain customers with information that gave them an advantage over other customers in determining what rate to bid.

---

[6]    Specifically, the SEC determined that each broker-dealer named in the 2006 Consent Decree, including BAS, *willfully* violated Section 17(a)(2) of the Securities Act of 1933, which prohibits material misstatements and omissions in any offer or sale of securities.

114.   The 2006 Consent Decree required the broker-dealers named therein, including BAS, to disclose certain auction practices and procedures to investors and to immediately stop engaging in certain other illicit practices, such as those listed above.  In addition, each broker-dealer named therein was required, not later than six (6) months from the date of the order, to have its CEO or its general counsel certify in writing to the SEC that it had implemented procedures reasonably designed to prevent and detect violations in the ARS area.  Finally, the broker-dealers named therein were required by the terms of the Consent Decree to pay civil penalties totaling $13 million.  Of this amount, BAS was responsible for paying $750,000.

115.   Accordingly, the Individual Defendants were well aware or should have been for years of the problems associated with their illicit ARS activities but willfully chose to turn a blind eye to them.

### BAS's Executives, Including Certain Individual Defendants, Are Over-Compensated and Unjustly Enriched During The Relevant Period

116.   Before Individual Defendants' ARS scheme eventually blew up on the Company and its shareholders, the Board approved awards of valuable financial benefits, including salaries, bonuses, and other compensation, to the Company's senior officers, including certain Individual Defendants, all of which were based on the Company's purported strong financial performance during the Relevant Period.  Critically, after it was revealed that the Company's purported strong financial performance (and corresponding compensation) was partly premised on Defendants' ARS scheme, which resulted in the Company having to expend more than *$4.7 billion*, the Board took no action to recoup any of these ill-gotten proceeds.

117.   Specifically, according to the Company's Proxy Statement filed on March 19, 2008 (the "Proxy"), during 2006 and 2007 (*i.e.,* the period after the 2006 Consent Decree was entered until the collapse of the ARS market in 2008 when Individual Defendants were aware of

the risks associated with the ARS market), certain of the Company's senior officers were overcompensated as follows:

| Name | Year | Salary | Stock and Option Awards | Non Equity Incentive Plan Compensation | All Other Compensation[7] | Total |
|---|---|---|---|---|---|---|
| Kenneth D. Lewis | 2007 | $1,500,000 | $15,639,383 | $4,250,000 | $3,454,657 | $24,844,040 |
| | 2006 | 1,500,000 | $16,665,580 | $6,500,000 | $3,207,768 | $27,873,348 |
| Joe L. Price | 2007 | $800,000 | $3,986,339 | $1,555,000 | $145,378 | $6,486,717 |
| Amy Woods Brinkley | 2007 | $800,000 | $6,449,517 | $1,555,000 | $530,845 | $9,335,362 |
| | 2006 | $800,000 | $5,531,620 | $3,450,000 | $610,902 | $10,392,522 |
| Barbara J. Desoer | 2007 | $800,000 | $6,826,790 | $2,400,000 | $505,723 | $10,532,513 |
| | 2006 | $800,000 | $5,597,162 | $3,575,000 | $463,969 | $10,436,131 |
| Liam E. McGee | 2007 | $800,000 | $8,167,717 | $3,050,000 | $135,310 | $12,153,027 |
| | 2006 | $800,000 | $5,690,944 | $3,875,000 | $167,982 | $10,533,926 |
| Brian T. Moynihan | 2007 | $718,859 | $6,913,139 | $2,270,000 | $202,276 | $10,104,274 |
| | 2006 | $700,000 | $6,873,002 | $3,050,000 | $259,985 | $10,882,987 |
| R. Eugene Taylor | 2007 | $800,000 | $7,550,565 | $4,000,000 | $947,682 | $13,298,247 |
| | 2006 | $800,000 | $6,035,787 | $3,675,000 | $729,654 | $11,240,441 |
| TOTAL | | | | | | $168,113,535 |

118.    Notably, the above-individuals earned a combined *$168,113,535* during 2006 and 2007 and, upon information and belief, none of this compensation was recouped by the Board after the meltdown of the ARS market *or* after the Company was forced to pay *$4.7 billion*. Accordingly, the compensation issued to the Company's senior officers was improper when issued in light of the Company's internally well-known exposure in connection with the ARS market.

## DERIVATIVE AND DEMAND ALLEGATIONS

119.    Plaintiff brings this action derivatively in the right and for the benefit of BAC to

---

[7] "All Other Compensation" includes "Change in Pension Value and Non Qualified Deferred Compensation Earnings" as reported in the Proxy.

redress injuries suffered, and to be suffered, by BAC as a direct result of the breaches of fiduciary duty, abuse of control, unjust enrichment, and gross mismanagement, by Defendants. BAC is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120. Plaintiff will adequately and fairly represent the interests of BAC in enforcing and prosecuting its rights, and has retained counsel experienced in litigating this type of action.

121. Plaintiff is and was an owner of the stock of BAC during times relevant to Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

122. In light of the foregoing events, on June 13, 2008, Plaintiff issued the Demand on the Board to commence an action against certain current and/or former directors and executive officers of the Company. *See* Exhibit A.

123. On August 12, 2010, more than two years after the issuance of the Demand, the Board, through the Company's Associate General Counsel and Assistant Corporate Secretary, Ms. Bennett, sent the Refusal to Plaintiff indicating that the Board, through the Audit Committee, had purportedly conducted an investigation and decided to refuse the demand. Ms. Bennett further stated that in connection with the so-called "investigation" of the issues raised in the Demand that over 100,000 pages of documents were reviewed and that "interviews of numerous individuals" were conducted.

124. The Refusal, however, provided no explanation as to what these purported "investigation" efforts – which the Plaintiff stockholder was forced to wait over two years for – actually revealed. Accordingly, even after two years, the Plaintiff stockholder has not been provided with a basis for the Refusal. *See* Exhibit B.

125. The Board's blanket Refusal and its failure to provide any explanation for the basis of the Refusal are improper and demonstrate its lack of diligence and good faith. Thus, this shareholder derivative action should be allowed to proceed.

## COUNT I
## AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

126. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

127. As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, that when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

128. The Individual Defendants willfully ignored the obvious and pervasive problems with BAC's internal controls practices and procedures, specifically as they related to the ARS market, and failed to make a good faith effort to correct the problems or prevent their recurrence even after the 2006 Consent Decree.

129. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT II
## AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

130. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131. The Individual Defendants owed and owe BAC fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe BAC the highest obligation of good faith, fair dealing, loyalty and due care.

132. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

133. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to repeatedly misrepresent the Company.

134. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, BAC has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

135. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

136. Plaintiff, on behalf of BAC, has no adequate remedy at law.

### COUNT III
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

137. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138. As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that BAC disseminated accurate, truthful and complete information to its shareholders.

139. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to BAC shareholders materially misleading and inaccurate information through, inter alia, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

140. As a direct and proximate result of Defendants' foregoing breaches of fiduciary

duties, the Company has suffered significant damages, as alleged herein.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

141.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of BAC.

143.    Plaintiff, as a shareholder and representative of BAC, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

144.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

145.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BAC, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing BAC to misrepresent material facts regarding its financial position.

146.    As a direct and proximate result of Defendants' abuse of control, BAC has sustained significant damages.

147.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

148.    Plaintiff, on behalf of BAC, has no adequate remedy at law.

## COUNT VI
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

149. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

150. Defendants had a duty to BAC and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of BAC.

151. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of BAC in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of BAC's affairs and in the use and preservation of BAC's assets.

152. During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused BAC to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to BAC, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged BAC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B. Directing BAC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company

and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to BAC restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 16, 2012                    **HARWOOD FEFFER LLP**

By: ~~Robert I. Harwood~~
Robert I. Harwood
Daniella Quitt
488 Madison Ave., 8th Fl.
New York, NY 10022
Telephone (212) 935-7400

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
Joseph M. Profy
22 Cassatt Ave.
First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677

**LAW OFFICE OF DEBRA S. GOODMAN, P.C.**
Debra S. Goodman
1301 Skippack Pike, Suite 7A, #133
Blue Bell, PA 19422
Telephone: (610) 277-6057

Counsel for Plaintiff

EXHIBIT A



# THE WEISER LAW FIRM, P.C.

121 N. WAYNE AVENUE, SUITE 100
WAYNE, PA 19087
TELEPHONE: (610) 225-2677
FACSIMILE: (610) 225-2678
WWW.WEISERLAWFIRM.COM

June 13, 2008

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Mr. Kenneth D. Lewis
Chairman, Chief Executive Officer, and President
Bank of America Corporation
Bank of America Corporate Center
100 North Tryon Street
Charlotte, NC 28255

Re:     **Shareholder Demand Pursuant to Del. Ct. Ch. R. 23.1**

Dear Mr. Lewis:

    We represent Matthew Pinsly (the "Stockholder"), a current stockholder of Bank of America Corporation ("BOA" or the "Company").

    Pursuant to Del. Ct. Ch. R. 23.1, we write on behalf of the Stockholder to demand that BOA's Board of Directors (the "Board") take action to remedy breaches of fiduciary duty and other violations of law by certain current and former directors and executive officers of the Company, including yourself, William Barnet III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Charles K. Gifford, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Jr., Meredith R. Spangler, Robert L. Tillman, Jackie M. Ward, J. Steele Alphin, Amy Woods Brinkley, and Joe L. Price. Collectively, the foregoing executive officers and directors of BOA will be referred to herein as "Management."

    As you are aware, by reason of their positions as officers and/or directors of BOA and because of their ability to control the business and corporate affairs of BOA, Management owed and owes BOA and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Management is also required to comply with the federal securities laws. The Stockholder believes that Management violated these core fiduciary duty principles from at least 2005 to the present (the "Relevant Period"), causing BOA to suffer damages.

1

# I. BACKGROUND

BOA is a Delaware corporation headquartered in Charlotte, North Carolina. According to its public filings, BOA is one of the world's leading financial firms and one of the largest banks in the U.S. by assets. BOA conducts its brokerage business through its wholly-owned subsidiaries, Banc of America Investment Services, Inc. ("BAIS") and Banc of America Securities, LLC ("BAS"). BAIS and BAS are each registered with the Securities and Exchange Commission (the "SEC") as broker-dealers pursuant to Section 15(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and are also members of the Financial Industry Regulatory Authority.

## A. Auction Rate Securities

The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." Auction rate securities have generally long-term maturities (typically 30 years) and in the case of preferred stocks, no maturity date. Auction rate securities were first introduced in the 1980s. Since then, the market for auction rate securities grew dramatically and the estimated value of auction rate securities in existence, at least prior to the collapse of the auction market in February 2008, was around *$350 billion*.[1]

Investments in auction rate securities were initially limited to institutional investors, with required minimums of $250,000. In recent years, however, issuers and sellers of auction rate securities have lowered the minimum amount invested to $25,000, in an effort to market auction rate securities as widely as possible to the general public. Auction rate securities were auctioned at par value, so that the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction.

The method for auctioning the securities was described in the prospectus of the respective fund through which they were offered, though the formula was substantially similar for all securities offered as auction rate securities. The number of days between each auction was set by the prospectus. Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period. The auction itself was of the type commonly referred to as a "Dutch" auction, *i.e.*, one where the price was initially set at a presumably economically unattractive level and then made more attractive to purchasers throughout the course of the auction. For auction rate securities, bids with successively higher rates were offered until all of the securities at the auction were sold.

At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate." The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction. If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the

---

[1] According to Barry Silbert, who runs the Restricted Securities Trading Network, "Of the $300 billion-plus market, between 10% and 30% of it will never trade at par again and I'm leaning more towards 30%."

clearing rate bidders. The auction agent, at the end of the auction, allocated the shares per the formula. If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus. This rate was generally lower than the market rate.

During an auction, an investor could submit one of four different orders: (1) a "Hold" order to keep the shares out of the auction regardless of the new interest rate; (2) a "Hold at Rate" order, where if the clearance rate was below the bid to hold rate, then the securities were sold; (3) a "Sell" order, which was to sell the shares at the auction regardless of the clearing rate; and (4) a "Bid" order, to submit a bid to buy at a new position at a specified minimum interest rate. Since there was no preference in awarding shares to existing holders and new buyers, there was little practical difference between a Hold at Rate order and a Buy order.

If there were not enough orders to purchase all the shares being sold at the auction, a failed auction occurred. In this situation, the rate was set to a "maximum rate" described by either a formula or a multiplier of a reference rate, such as the Bond Market Association index. Either way, the maximum rate was set out in the prospectus. If the auction failed, then none of the current shareholders could sell their shares no matter what type of order they issued. The maximum rate for many auction rate securities, particularly those invested in corporate debt securities or preferred stocks, was relatively small, however. As a result, if the auction failed, owners unable to sell their shares would receive limited interest on their illiquid investments.

The issuer of each auction rate security selected one or more broker-dealers (such as BAIS and BAS) to underwrite the offerings and to manage the auction process. Investors could only submit orders through the selected broker-dealers. The issuer paid an annualized fee to each broker-dealer engaged to manage an auction. Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer. This deadline was generally set early enough by the broker-dealer so that it had time to process and analyze the orders before having to submit the orders to the auction agent. This gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.

## B.    The SEC Consent Decree

Significantly, during the Relevant Period, broker-dealers would often engage in a number of illicit practices to influence the auction process, including, for example, *submitting their own orders to purchase or sell shares for their own accounts*. Thus, in 2004, the SEC began to investigate these highly manipulative practices affecting the auction market.

Two years later, on May 31, 2006, the SEC entered into a consent decree (the "2006 Consent Decree") with a number of major broker-dealers, *including BOA's wholly-owned subsidiary BAS*. The 2006 Consent Decree summarized the findings of the SEC investigation -- namely, that between January 2003 and June 2004, each broker-dealer named therein, including BAS, engaged in one or more practices that were not adequately disclosed to investors in violation of the federal securities

laws.[2] The violative conduct cited by the SEC included, among other things:

- allowing customers to place open or market orders in auctions;

- intervening in auctions by bidding for a firm's proprietary account or asking customers to make or change orders in order to prevent failed auctions, set a "market" rate, or prevent all-hold auctions;

- submitting or changing orders, or allowing customers to submit or change orders, after auction deadlines;

- not requiring certain customers to purchase partially-filled orders even though the orders were supposed to be irrevocable;

- having an express or tacit understanding to provide certain customers with higher returns than the auction clearing rate; and

- providing certain customers with information that gave them an advantage over other customers in determining what rate to bid.

The 2006 Consent Decree required the broker-dealers named therein, including BAS, to disclose certain auction practices and procedures to investors and to immediately stop engaging in certain other illicit practices, such as those listed above. In addition, each broker-dealer named therein was required, not later than six (6) months from the date of the order, to have its CEO or its general counsel certify in writing to the SEC that it had implemented procedures reasonably designed to prevent and detect violations in the auction rate securities area. Finally, the broker-dealers named therein were required by the terms of the Consent Decree to pay civil penalties totaling $13 million. Of this amount, BAS was responsible for paying $750,000.

As described above, the 2006 Consent Decree noted that in many cases, the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed publicly. However, the 2006 Consent Decree did not end the practice of broker-dealers submitting bids for their own accounts after receiving notice of what orders their customers planned to place, so long as the broker-dealers disclosed this practice to their customers.

---

2 Specifically, the SEC determined that each broker-dealer named in the 2006 Consent Decree, including BAS, *willfully* violated Section 17(a)(2) of the Securities Act of 1933 (the "Securities Act"), which prohibits material misstatements and omissions in any offer or sale of securities.

## C.    Management's False and Misleading Representations

During the Relevant Period, auction rate securities were extremely profitable for BOA and for the BOA brokers and financial advisors who sold auction rate securities. Individual BOA financial brokers and advisors had a significant financial incentive to sell auction rate securities, as they were compensated by BOA for each auction rate security sold.

In order to perpetuate the auction market and sell as many auction rate securities as possible, during the Relevant Period, *Management represented to investors in its written materials and uniform sales presentations by financial advisors that auction rate securities were the same as cash and were highly liquid, safe investments for short-term investing.* Pursuant to uniform sales materials and "top-down" directives from Management, BOA financial advisors throughout the U.S. represented to current and potential BOA clients that the auction rate securities sold by BOA were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

Management failed to disclose to purchasers of auction rate securities material facts about these securities. For example, Management failed to disclose that these securities were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. In addition, Management failed to disclose that the auction rate securities the Company was selling were only liquid at the time of sale, because broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability. In fact, throughout the Relevant Period, the ability of holders of auction rate securities to liquidate their positions depended on the maintenance of an artificial auction market maintained by broker-dealers. When broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the auction rate securities sold by BOA became illiquid. Management also failed to disclose that the auction rate securities BOA was selling were not short-term investments, but rather long-term bonds or preferred stocks with maturities sometimes exceeding 30 years. Finally, Management failed to disclose that the short-term nature of the securities and the ability of investors to quickly convert their auction rate securities into cash depended entirely on the perpetuation of the artificial auction market being maintained by broker-dealers.

Management also failed to disclose to purchasers of auction rate securities material facts about the Company's role in the auctions and the auction market in which these securities traded. For example, Management failed to disclose that broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions. Management failed to disclose that without this manipulation of the auction market, many auctions likely would have failed, as a result of which investors would have had the ability to determine the true risk and liquidity features of auction rate securities. Management caused the Company to continue aggressively marketing auction rate securities after they had determined that broker dealers were likely to withdraw their support for the periodic auctions, and that a "freeze" of the market for

5

auction rate securities would result.

During the Relevant Period, Management failed to disclose that the auctions BOA participated in on behalf of its clients were not governed by arms-length transactions, but instead suffered from systemic flaws and manipulative practices. Such practices included, among other things, allowing customers to place open or market orders in auctions, preventing failed auctions and all-hold auctions to set the market rate, submitting or changing orders after auction deadlines, not requiring customers to purchase partially-filled irrevocable orders, providing certain customers with higher returns than the auction clearing rate, and providing inside information about the auction process to certain customers in connection with the auction bidding.

### D. The Auction Rate Securities Market Collapses

In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire auction rate securities market. In the fall and winter of 2007, however, more auctions began to fail. Nonetheless, Management caused BOA to continue encouraging investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the risks associated with the securities.

On February 13, 2008, *87% of all auctions of auction rate securities failed when all of the major broker-dealers refused to continue to support the auctions*. The next day, February 14, 2008, it was disclosed that UBS, the second-largest underwriter of auction rate securities, had decided to no longer support the auction market. Virtually every other major broker-dealer (including, among others, Goldman Sachs, Lehman Brothers, and Citigroup) also decided around the same time to withdraw their support of the auction market. As a result of the nearly simultaneous withdrawal of support by all of the major broker-dealers, *the market for auction rate securities collapsed, rendering more than $300 billion of outstanding securities illiquid*.

## II. DEMAND PURSUANT TO DEL. CT. CH. R. 23.1

Based on these events, the Stockholder contends that Management: (i) breached their fiduciary duties of loyalty and good faith in connection with their management, operation and oversight of BOA's business; (ii) breached their fiduciary duty of good faith to establish and maintain adequate internal controls; and (iii) breached their fiduciary duties by disseminating misleading information.

Accordingly, pursuant to Del. Ct. Ch. R. 23.1, on behalf of the Stockholder, I hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into the violations of the Exchange Act, the Securities Act, and/or Delaware law committed by BOA and/or BAIS and/or BAS during the Relevant Period; and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

If within a reasonable period of time after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

THE WEISER LAW FIRM, P.C.

Robert B. Weiser

cc:     Matthew Pinsly

EXHIBIT B



Jennifer E. Bennett
Associate General Counsel
Office of the Corporate Secretary

August 12, 2010

**VIA CERTIFIED MAIL**
**Return Receipt Requested**
**Receipt # 7005 3110 0002 5514 1634**

Robert B. Weiser, Esquire
The Weiser Law Firm, P.C.
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087

Re:     **Letter on behalf of Matthew Pinsly, dated June 13, 2008, to the Board of Directors of Bank of America Corporation**

Dear Mr. Weiser:

On behalf of the Board of Directors (the "Board") of Bank of America Corporation (the "Corporation"), I write to respond to your letter dated June 13, 2008, sent on behalf of your client, Matthew Pinsly, demanding an investigation of certain matters relevant to losses allegedly suffered by the Corporation in connection with the activities of Bank of America Investments, Inc. ("BAI") and Banc of America Securities LLC ("BAS") relating to auction rate securities ("ARS") from 2005 through the date of the your letter, in addition to requesting the initiation of an investigation and litigation by the Corporation with respect to alleged wrongdoing referenced in the letter (the "Demand"). Following receipt of your letter, the Board retained Potter Anderson & Corroon LLP ("Potter Anderson") to assist it in investigating the allegations raised in the Demand. Subsequently, the Board delegated oversight for the continuing investigation to the Audit Committee and directed the Audit Committee to make a recommendation to the Board with respect to the Demand upon conclusion of the investigation.

The investigation conducted under the supervision of the Board and Audit Committee was extensive. It involved the preservation, collection, production, and review of more than 100,000 pages of potentially relevant documents, collection of available market and industry data and information, consideration of a Securities and Exchange Commission ("SEC") investigation of the Corporation's ARS practices, interviews of numerous individuals, and analysis of the legal claims discussed in the Demand and potential defenses thereto. The documents reviewed –

ranging from Board and committee minutes to policies and procedures to SEC transcripts to emails – described in detail the Corporation's activities relevant to the Demand. The investigation also included a review of various public documents, including the Corporation's public statements and filings with the SEC, regulatory pronouncements, accounting principles, news and research relating to ARS, as well as other pertinent information.

Among the individuals interviewed were representatives from BAI and BAS, the risk managers that supported these units and related businesses, and various members of the Corporation's senior management. No limits were placed on the questions asked during the interviews, and none of the individuals that were interviewed refused to answer any of the questions posed.

At the conclusion of the investigation, the Board considered the Demand at its June 23, 2010 meeting and determined, based on the recommendation of the Audit Committee, that it is not in the best interests of the Corporation to pursue the claims outlined in the Demand. Accordingly, the Board has declined to take any of the actions requested. In reaching this determination, both the Audit Committee and the full Board weighed the legal analysis, as well as practical and business considerations. Both the Audit Committee and the full Board considered, among other things, the legal barriers to recovery and business and practical considerations such as the likelihood of recovering any meaningful amount from the defendants in the lawsuit proposed in the Demand.

We are grateful for the trust you have placed in the independence and business judgment of the Board to consider the issues raised in the Demand. Should you have any questions about the foregoing, please do not hesitate to contact me.

Very truly yours,

Jennifer E. Bennett
Associate General Counsel and
Assistant Corporate Secretary

## BANK OF AMERICA CORPORATION VERIFICATION

I, Matthew Pinsly, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 4-3-12

_____
Matthew Pinsly